UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Richard Weeks | ) | |
| and | ) | |
| Joy Johnson | ) | |
| and | ) | |
| Ronnie Mullins | ) | |
| and | ) | |
| Larry Kocherhans | ) | |
| and | ) | Case No: 4:20-cv-622 |
| Michael Applebaum | ) | |
| and | ) | |
| Philip McNamee | ) | |
| and | ) | |
| Doug Lichtinger | ) | |
| and | ) | |
| Sharon Plett | ) | |
| and | ) | |
| Glen Ingvalson | ) | |
| and | ) | |
| Chris Jacks | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Tracy PAI Management LTD | ) | |
| d/b/a Glenridge Capital | ) | |
| d/b/a Bee Options | ) | |
| d/b/a Rumelia Capital | ) | JURY TRIAL DEMANDED |
| | ) | |
| SERVE AT: | ) | |
| David Cartu, | ) | |
| Hatehila 12c, Natanya, | ) | |
| 4272012, Israel | ) | |
| | ) | |
| and | ) | |
| | ) | |
| David Cartu, an individual | ) | |
| | ) | |
| SERVE AT: | ) | |
| Hatehila 12c, Natanya, | ) | |
| 4272012, Israel | ) | |
| | ) | |
| Defendants. | ) | |

1

## CLASS ACTION COMPLAINT

COME NOW, Plaintiffs Richard Weeks, Joy Johnson, Ronnie Mullins, Larry Kocherhans, Michael Applebaum, Philip McNamee, Doug Lichtinger, Sharon Plett , Glen Ingvalson and Chris Jack (collectively "Plaintiffs"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, and on behalf of all similarly situated persons, bring this Class Action Complaint against Defendants Tracy PAI Management LTD ("Tracy PAI") d/b/a Glenridge Capital ("Glenridge Capital"), d/b/a Bee Options ("Bee Options") d/b/a Rumelia Capital ("Rumelia Capital") and David Cartu ("Cartu") (collectively "Defendants") and for their causes of action against Defendants state as follows:

## NATURE OF THIS ACTION

1.  This is a mass tort action, wherein Plaintiffs were defrauded of money though a scheme perpetrated by Tracy PAI, an Israeli firm, and its principal, individually, and through its agents, claiming to assist vulnerable American clients with the sale and purchase of highly speculative binary options.

2.  Tracy PAI operated a "bucket shop" through Glenridge Capital, Bee Options and Rumelia Capital where these unlicensed and unregulated binary options were purportedly being sold.

3.  The platform did not actually purchase any security, merely taking the investors' money.

4.  Since binary options are extremely speculative, and a wrong choice results in total loss of investment, the victim's account went to zero value rather quickly.

5.  The only way the victims knew they were the victim of a scam was when they appeared to be winning, and tried to withdraw their winnings, and it was impossible.

## THE PARTIES

6. Plaintiff Richard Weeks is a natural person who resides in Saint Louis Country, Missouri.

7. Plaintiff Joy Johnson is a natural person who resides in St. Thomas, United States Virgin Islands.

8. Plaintiff Ronnie Mullins is a natural person who resides in Joplin, Missouri.

9. Plaintiff Larry Kocherhans is natural person who resides in Farmington, Utah.

10. Plaintiff Michael Applebaum is natural person who resides in San Jose, California.

11. Plaintiff Philip McNamee is a natural person who resides in Honolulu, Hawaii.

12. Plaintiff Doug Lichtinger is natural person who resides in Erie, Pennsylvania.

13. Plaintiff Sharon Plett is a natural person who resides in Minneapolis, Minnesota.

14. Plaintiff Glen Ingvalson is a natural person who resides in Minneapolis, Minnesota.

15. Plaintiff Chris Jacks is natural person who resides in Edmond, Oklahoma.

16. Defendant Tracy PAI is an Israeli corporation located in Natanya, Israel.

17. Defendants Glenridge Capital, Bee Options and Rumelia Capital are fictitious names of Tracy PAI which lack any corporate existence in Missouri or the United States.

18. Defendant Cartu is a natural person residing in Natanya, Israel.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over this matter because Defendants transacted business in Missouri by soliciting Missouri residents through both telephone and internet of things (IOT) and by taking money from Missouri residents.

20. Defendants' marketing actions occurred in Missouri and in many other forums around the world and caused damage to Plaintiffs as described more fully below.

21. Upon information and belief, Tracy PAI targeted United States citizens because

management believed that U.S. citizens have no problem investing large amounts of money.

22. Defendants have sufficient minimum contacts with Saint Louis, Missouri, and have frequently targeted and defrauded citizens of Saint Louis, Missouri, including co-plaintiff Weeks, therefore the forum of Saint Louis, Missouri has an interest in adjudicating this suit and venue is proper pursuant to 28 U.S.C §1391. Further, Defendants have committed torts within the State of Missouri.

## COMMON FACTUAL ALLEGATIONS

### Relationship Among the Defendants

23. David Cartu was the sole shareholder and director of Tracy PAI and exercised complete domination over it.

24. Tracy PAI had no mind or existence of its own beyond the mind and existence of David Cartu. David Cartu used Tracy PAI to commit fraud, and to breach his legal and ethical duties.

25. Cartu operated Tracy PAI to sell binary options through various fictitious entities including Glenridge Capital, Bee Options and Rumelia Capital.

26. Cartu established Tracy PAI to make it harder to connect Tracy PAI and its officers to the fraud that was committed under the brand names Glenridge Capital, Bee Options and Rumelia Capital and in order to hide their ill-gotten profits more effectively.

27. In fact, Cartu actively tried to disguise Tracy PAI's binary options operations. One way he did this was by asking his employees to alter their LinkedIn profiles so that Tracy PAI was described as a marketing or customer support company.

28. Cartu and Tracy PAI were in direct control of the fictitious entities Glenridge Capital, Bee Options and Rumelia Capital and directed their day-to-day operations.

29. The fictitious names Glenridge Capital, Bee Options and Rumelia Capital existed as shell companies in furtherance of the fraudulent enterprise to defraud victims under the guise of selling binary options.

30. The only purpose of Glenridge Capital, Bee Options and Rumelia Capital was the fraudulent sale of binary options.

31. Glenridge Capital, Bee Options and Rumelia Capital engaged in no legitimate business activities as no binary options, or any other security, were actually being sold. Accordingly, they were mere artifices to fraud, and the corporate veil may therefore be pierced.

32. Tracy PAI ran all operations, including the call center for Glenridge Capital, Rumelia Capital and Bee Options out of Tracy PAI's Israeli offices first in Hachilzon 3, Ramat Gan, 5252269, Israel and later from its offices in Ben Gurion David 1, 25th Floor, Bnei Brak, 5120149, Israel.

33. Any registration by Glenridge Capital, Bee Options and Rumelia Capital in London and/or Ireland was to mask their actual owners and operations.

34. David Cartu's role in the fraudulent operations of Tracy PAI through Glenridge Capital, Bee Options and Rumelia Capital was hands-on, as he directed where the monies should be sent and managed the company employees directly. Cartu's domination extended to finances, policy and business practices related to Tracy PAI's transactions with Plaintiffs.

35. Jointly Defendants were a complex criminal enterprise devoted solely to the furtherance a fraudulent scheme who knowingly and intentionally acted in concert to perpetrate the fraud.

The Scheme

36. Binary options are a type of over the counter ("OTC") securities trade in which the investor decides whether a stock will go up or down, and they receive a fixed payout if their prediction is correct, or lose the entire value of the investment if their prediction is wrong.

37. Defendants used internet advertisements to draw in potential victims. These advertisements falsely promised high qualified staff and advisors and state of the art trading systems, as well as guaranteed profits.

38. Agents, under management's instructions, used aliases, and falsely claimed to operate in financial hubs such as London and the United Kingdom. Agents falsely claimed to have financial licenses, Ivy League degrees, many years of investing experience, and financial knowledge/trading algorithms which they knew to be false.

39. Agents promised victims "risk-free" trades, and told victims there were insurance policies on their initial investments, which would make total loss impossible.

40. The agents claimed that Tracy PAI profited only when the client won, and lost money when the client lost. In fact, the exact opposite was true.

41. The fraud was very hard to detect, since had binary options actually been purchased the account balance would still be zero. Victims were led to believe the losses were the result of trades on the live market and their own fault. **However, no binary options were ever purchased, and defendants merely pocketed Plaintiff's money.**

42. Tracy PAI had both access and at times control of the trading platform. With those privileges, Tracy PAI employees were instructed to manipulate the platform. Sometimes it was manipulated to the victim's benefit in order to induce him to invest more and trade more.

43. Other times, Tracy PAI agents were instructed to "burn the client" which included

6

manipulating the platform so that the clients' accounts were set to zero. The victims were under the impression that the loss was the result of trades by the agent on their behalf and therefore were not aware of the scam.

44. Tracy PAI manipulated the platform by controlling the spreads and times of the trades.

45. Agents of the Defendants frequently contacted victims to induce them to invest more money. The agents and employees of Tracy PAI offered bonus trading funds if the victim invested a certain amount of additional cash. This was an easy ploy as the bonus cash was imaginary. The bonus was always accompanied by onerous terms and conditions, that a particular trade turnover must be reached before any withdrawals can be completed, up to sixty times the trading volume. The victims were never explained the terms and conditions attached to the bonus before it was injected into their trader account. Consequently, the bonus was used as an excuse to refuse a withdrawal.

46. Tracy PAI employees earned commissions on the profits to Tracy PAI, incentivizing the agents to persuade a victim to deposit more money.

47. Tracy PAI's profit was the amount of money its agents, designated to one of the three brands Glenridge Capital, Bee Options and Rumelia Capital, fleeced from victims. The modus operandi was for defendants to steal as much money as possible and by any means necessary, ultimately leaving victims penniless.

48. Agents of the defendants shamed, bullied and intimidated victims into investing all of their available funds into the fraud. When funds were exhausted, they used the same tactics to humiliate their victims into believing the losses were their own fault. This caused feelings of shame and guilt, as well as stress, anxiety and depression related to the total financial losses, and subsequent poverty.

49. Defendants encouraged victims to trade until many victims lost everything, and were left destitute. The typical victim lost their entire savings in a matter of months. This caused additional mental and emotional suffering.

50. Any money deposited with Tracy PAI could never have been withdrawn without the defendants allowing it. Victims were assured they could retrieve their money at any time, but the trading platform did not allow for withdrawals to be processed without permission.

51. The Technical Risk Department monitored clients for 'risk', which meant that a client was profiting too much, had stopped trading and was capable now of withdrawing the money.

52. The platform was set up to not permit withdrawals unless Tracy PAI permitted it, and contained onerous requirements for withdrawal. This was despite representing to victims before they deposited money that a withdrawal was simple and instantaneous. Even upon completing the very time consuming and unreasonable steps as demanded by Tracy PAI, withdrawals were denied without explanation. The victim was then ignored, because the money had already been stolen.

Missouri Secretary of State Actions

53. On October 31, 2017, the Enforcement Section of the Missouri Securities Division of the Office of Secretary of State, issued a Cease and Desist Order against Rumelia Capital after the firm allegedly solicited Missouri residents through email, promising returns through binary trading.

54. The Rumelia Capital Order found that Rumelia Capital had never been registered in Missouri as an investment advisor, investment advisor representative, broker-dealer, broker-dealer agent, and/or issuer agent and that it offered and sold unregistered, non-exempt securities in Missouri in the form of binary options in exchange for money.

55. On July 25, 2018, the Enforcement Section of the Missouri Securities Division of the Office of Secretary of State, issued a Cease and Desist Order against, Glenridge Capital and Tropical Trade (another Tracy PAI brand), after the firms allegedly sold unregistered, non-exempt binary options to Missouri investors. This was followed by a final cease and desist against Glenridge Capital and Tropical Trade, concluding in the order that the brands made "untrue statements, omitted material facts or engaged in fraud".

56. The Glenridge Capital Order found that Glenridge Capital had never been registered in Missouri as an investment adviser, investment adviser representative, broker-dealer, broker-dealer agent, and/or issuer agent.

## The Proposed Class

57. Pursuant to Federal Rules of Civil Procedure 23(a) and(b), Plaintiffs bring this action on behalf of themselves and the Class, particularly the following Nationwide Class of similarly situated persons defined as:

> All persons who were targeted through telephone and/or the internet by Glenridge Capital, Bee Options or Rumelia Capital and who deposited and lost money which was paid for the supposed trading of binary options.

58. Members of the Class are so numerous that their individual joinder is impractical. The precise identities, numbers and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants and their records.

59. There are questions of law or fact common to the Class, including:

a. Whether Defendants engaged in fraudulent conduct by representing to the Class that Defendants were competent financial advisors who could assist in the successful trading of binary options thereby inducing the Class members to deposit funds with Defendants which were lost.

    b. Whether Defendants' practices and conduct with respect to the fake binary options trading violated the Missouri Merchandising Practices Act.

    c. Whether Defendants' practices and conduct with respect to the fake binary options trading violated RICO.

    d. Whether the Class is entitled to recover actual damages based upon Defendants' fraudulent conduct.

    e. Whether the Class is entitled to an award of statutory or punitive damages as a result of Defendants' fraudulent conduct.

    f. Whether the Class is entitled to an award of reasonable attorneys' fees, prejudgment interest and costs of suit.

60. Plaintiffs' claims are typical of the claims of the Class and predominate over any questions impacting only individual members.

61. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interest of the members of the class they seek to represent.

62. Plaintiffs have retained counsel who is competent and will fairly and adequately protect the interests of the class.

**COUNT I – COMMON LAW FRAUD**
**Plaintiffs v. Defendants**

63. Plaintiffs reallege by reference each and every above allegation as though fully set forth herein.

64. Defendants, jointly and severally, made the following false representations to Plaintiffs:

    i. Defendants represented themselves as having a functional trading platform where trades were actually being made;

    ii. Defendants represented themselves as experts in the field;

    iii. Defendants represented to Plaintiffs that Defendants only profited when Plaintiffs profited;

    iv. Defendants represented that withdrawing money from the trading accounts would be simple and always authorized; and

    v. Defendants represented trades were guaranteed and/or insured.

65. These representations were material.

66. Defendants, knew that the representations were false and specifically that:

    i. There was no functional platform and no trades were being made;

    ii. Defendants only profited when Plaintiffs lost money;

    iii. The trades were not guaranteed or insured;

    iv. Withdrawals were not possible without Defendants' permission; and

    v. Defendants had no experience in the financial markets.

67. Defendants, jointly and severally, intended that Plaintiffs would rely on the representations in providing monies to Defendants to be "traded".

68. Plaintiffs had a right to and did rely upon the false representations as each of the Plaintiffs provided money to Defendants as a result of the false representations.

69. Plaintiffs did not know of the falsity of Defendants' representations.

70. Defendants knew that investors would, because of their ignorance of the falsity of Defendants' representations reasonably rely on the statements made by defendants.

71. Plaintiffs were damaged as a result of the false representations of Defendants as they lost all monies invested with Defendants and were left financially strained and in debt. The specifics of Plaintiffs' damages are set forth in the ensuing paragraphs.

72. Between November 10, 2015 and October 28, 2016, Richard Weeks deposited and lost $61,751.56 through Glenridge Capital.

73. Between November 16, 2016 and January 25, 2017, Joy Johnson deposited and lost $30,600 through Rumelia Capital. .

74. Between August 29, 2016 and August 31, 2016, Ronnie Mullins deposited and lost $10,000 through Glenridge Capital.

75. Between on or about October 7, 2015 and January 27, 2017, Larry Kocherhans deposited and lost $282,949.86 through Glenridge Capital.

76. Between on or about February 23, 2016 and January 3, 2018, Michael Applebaum deposited and lost $40,617.76 through Glenridge Capital.

77. Between July 16, 2016 and January 26, 2017, Philip McNamee, deposited and lost $289,722 through Glenridge Capital.

78. Between on or about February 8, 2016 and November 18, 2016, Doug Lichtinger, deposited and lost $131,250 through Glenridge Capital.

79. Between on or about November 9, 2015 and March 14, 2017, Sharon Plett, deposited and lost $71,221.38 through Glenridge Capital.

80. Between on or about July 26, 2016 and March 1, 2017, Glen Ingvalson deposited and lost $151,103 through Glenridge Capital.

81. Between January 14, 2016 and January 4, 2017, Christopher Jacks deposited and lost $109,127.75 through Glenridge Capital.

82.  Plaintiffs each also suffered emotional anguish associated with being a victim of a fraud including stress and anxiety.

83. Defendants' conduct was willful, wanton, and intentional, with the conscious end of defrauding potential investors of their savings, thereby justifying the imposition of punitive damages in the amount of three times the actual damage sustained by each Plaintiff.

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all issues so triable and request judgment against Defendants, jointly and severally, for actual damages, punitive damages, actual costs, pre-judgment interest, post-judgment interest, attorneys' fees and any other such relief the court may deem just and proper.

### COUNT II – Missouri Merchandising Practice Act (MMPA)
### Plaintiffs v. Defendants

84. Plaintiffs reallege by reference each and every above allegation as though fully set forth herein.

85. Plaintiffs purchased merchandise from Defendants in the form of financial services.

86. The financial services were purchased for personal, family or household purposes.

87. The financial services were never rendered, since the trading platform was a fraudulent device and Plaintiffs' monies were taken without any financial services ever being provided.

88. Defendants' actions were unlawful.

89. As a result of Defendants' unlawful practices, Plaintiffs suffered damages as set forth in detail in Count I herein.

90. Defendants' conduct was willful, wanton, and intentional, with the conscious end of defrauding potential investors of their savings, thereby justifying the imposition of punitive damages in the amount of three times the actual damage sustained by each Plaintiff.

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all issues so triable and request judgment against Defendants, jointly and severally, for actual damages, punitive damages, actual

costs, pre-judgment interest, post-judgment interest, attorneys' fees and any other such relief the court may deem just and proper.

### COUNT III – CIVIL RICO
### Plaintiffs v. Defendants

91. Plaintiffs reallege by reference each and every above allegation as though fully set forth herein.

92. Cartu, through Tracy PAI, directed its shell companies, Glenridge Capital, Bee Options and Rumelia Capital, and its agents and employees to seek out victims from across the world, and used the internet to have them pay for an online binary options trading platform which did not exist.

93. Individuals who believed they were investing in binary options, were simply having their money taken, and all relevant agents were aware of the fraud when it was being committed.

94. Defendants' pattern of conduct constituted the intentional creation of an enterprise dedicated to racketeering activity and whose activities effect interstate commerce.

95. Defendants' conduct resulted in injury to Plaintiffs' property.

96. The relevant predicate racketeering activity was wire and telephone fraud, since the internet was used to convince Plaintiffs to pay for a non-existent options trading platform.

97. Thus, Plaintiffs seek relief under Racketeering Influenced Corrupt Organization Act's civil cause of action, 18 U.S.C. §1964, entitling them to treble damages.

98. Defendants' conduct was willful, wanton, and intentional, with the conscious end of defrauding potential investors of their savings, thereby justifying the imposition of punitive damages in the amount of three times the actual damage sustained by each Plaintiff.

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all issues so triable and request judgment against Defendants, jointly and severally, for statutory damages, actual damages, punitive

or treble damages, actual costs, pre-judgment interest, post-judgment interest, attorneys' fees and any other such relief the court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs Richard Weeks, Joy Johnson, Ronnie Mullins, Larry Kocherhans, Michael Applebaum, Philip McNamee, Doug Lichtinger, Glen Ingvalson, Sharon Plett and Chris Jacks, request a trial by jury in the above captioned matter.

Respectfully Submitted,

FRANKEL, RUBIN, KLEIN,
   SIEGEL, PAYNE & PUDLOWSKI, P.C.

By:/s/ Mayer S. Klein_____
MAYER S. KLEIN, #32605
mklein@frankelrubin.com
Attorney for Defendant
231 South Bemiston Avenue, Suite 1111
Clayton, Missouri  63105
Telephone: (314) 725-8000
Facsimile:  (314) 726-5837